U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

MAR 2 1 2003

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

| TANGO MOTOR TRANSIT, INC., D/B/A TMT, INC. AND TANGO TRANSPORT, INC. | NUMBER: 33042 |
|---|---|
| VERSUS | THIRTY NINTH JUDICIAL DISTRICT COURT |
| APPALACHIAN LEASING SERVICES, INC., T & L TRANSPORTATION SERVICES, INC., AND ROGER HOOD, INDIVIDUALLY AND D/B/A T & L TRANSPORTATION SERVICES, INC. | RED RIVER PARISH, LOUISIANA |

CV03 - 0536 - S
JUDGE WALTER

MAGISTRATE JUDGE PAYNE

## PETITION FOR DECLARATORY JUDGMENT

The petition of TANGO MOTOR TRANSIT, INC., D/B/A TMT, INC. (hereinafter "TMT"), a Texas corporation domiciled in Red River Parish, Louisiana and TANGO TRANSPORT, INC. (hereinafter "Tango"), a Texas corporation domiciled in Red River Parish, Louisiana, (hereinafter collectively "plaintiffs") represents that:

1.

Named defendants herein are:

(1) APPALACHIAN LEASING SERVICES, INC. (hereinafter "Appalachian"), a foreign corporation not authorized to do business in, Louisiana;

(2) T & L TRANSPORTATION SERVICES, INC. (hereinafter "T & L"), a foreign corporation not authorized to do business in Louisiana; and

(3) ROGER HOOD, INDIVIDUALLY AND D/B/A AS T & L TRANSPORTATION SERVICES, INC., a natural person who resides outside of Louisiana.

2.

Petitioner herein requests that citation be issued by the Clerk of this Honorable Court to Appalachian at 1999 Ky. Rt. 1428, Prestonburg, Kentucky 41653-1370, T & L at 215 Maddox-Simpson Parkway, Lebanon, Tennessee 37088, and Roger Hood, 2214 Barnes Dr., Lebanon, Tennessee 37087, the citations and petition to be served in accordance with La. R.S. 13:3201, et seq., the Louisiana Long Arm Statute.



3.

Plaintiffs bring this declaratory relief action, requesting that this Honorable Court declare the rights, status, and legal relations of the parties, as well as any other relief that the Court deems to be equitable.

4.

TMT, Tango and T & L are trucking companies. Appalachian provides leasing and financing on trucks.

5.

During the first week of April 2002, TMT was approached by T & L. At that time, T & L was having severe financial difficulties. T & L was unable to pay the lease payments on its trucks; these lease payments were several months in arrears in April of 2002. In addition, T & L could not pay the mortgage payment on its terminal. Moreover, T & L could not afford insurance and other infrastructure costs. Finally, Roger Hood was facing personal liability from T & L's inability to make payments on the loans on the trucks and the terminal.

6.

T & L requested that TMT and T & L enter into an agreement whereby TMT would sublease T & L's trucks and terminal and provide the lease payments on T & L's trucks and terminal during the term of the agreement. Second, TMT would provide routine and scheduled maintenance on T & L's trucks, as well as bringing those trucks up to specifications. Third, TMT would provide insurance and infrastructure, i.e., billing, accounts payable, accounts receivable. Fourth, TMT was to provide employment to T & L's principal, Roger Hood. Fifth, TMT was to provide a loan in the amount of $225,000.00, to be secured by T & L's receivables. (The $225,000 was essential to the deal, because in the absence of the loan T & L would not be able to operate, even under the umbrella of TMT.)

7.

In exchange for these things from TMT, T & L was to provide to TMT access to T & L's trucks, drivers, terminal, customers, and customer lists. In addition, Mr. Hood was to secure his existing customers' business for TMT, as well as solicit new business from his existing

customers. Moreover, Mr. Hood was to expand his existing customer base. Mr. Hood made representations that he would deliver sufficient traffic to keep the equipment busy enough to generate sufficient revenue for TMT.

8.

Appalachian was the lessor of T & L's trucks.

9.

Initially, TMT and T & L attempted to agree on terms and reduce these terms to writing. TMT prepared a Letter of Understanding, setting forth proposed terms of this agreement. T & L did not sign the Letter of Understanding; instead, T & L changed the terms and sent it back to TMT for signature. TMT never signed this Letter of Understanding.

10.

In addition to the never-consummated Letter of Understanding, a Lease Agreement was drafted. However, this Lease Agreement was likewise never consummated by the parties.

11.

Around this same time, TMT prepared an Employment Contract for Roger Hood to sign. Like the Letter of Understanding and the Lease Agreement, the parties never signed this proposed agreement.

12.

In the meantime, on April 8, 2002, the parties began operating in the absence of any written agreement. However, a short statement of lease between Tango and T & L was placed in the T & L trucks so that the parties would be in compliance with federal regulations.

13.

Early on, T & L requested that TMT provide the lease payments due to it directly to Appalachian. Thus, TMT provided lease payments to Appalachian solely at the request of T & L.

14.

During the first several months, plaintiffs upgraded the condition of the T & L trucks. Plaintiffs spent over $300,000.00 on these trucks for bringing these trucks up to specifications.

including new tires, brakes, air conditioning work, and major body work on most of the trucks. In addition, many of the T & L trucks were undrivable at the onset of the agreement and plaintiffs provided work necessary to get these trucks back on the road. Plaintiffs agreed to spend this money based on the understanding that these costs would be offset by revenues generated by the trucks. At the termination of the agreement, these trucks as a whole were returned to T & L in significantly better shape than they were at the beginning of the agreement.

15.

During the term of the agreement, TMT made all lease payments on T & L's terminal, as well as providing insurance and infrastructure to T & L.

16.

During the term of the agreement, TMT provided employment to Roger Hood. However, Roger Hood was unable to generate sufficient business from his existing customers or new customers to make the T & L venture profitable or merely break even for TMT. In fact, business from T & L's existing customers decreased significantly after the onset of the relationship between TMT and T & L. Moreover, Roger Hood failed to provide new customers and business to TMT as he had promised to do.

17.

In October of 2002, TMT informed Roger Hood that it intended to terminate the agreement between TMT and T & L. Roger Hood promised TMT that his customers' business would pick up soon and that the agreement would ultimately be profitable for TMT. TMT relented in its desire to terminate the agreement in October of 2002.

18.

However, the fact that this agreement was causing significant financial losses for TMT, along with the $300,000.00 spent on maintenance and improvement of the T & L trucks, caused TMT to become cash strapped. In October of 2002, TMT ceased making payments on the T & L truck leases, with the exception of one payment.

19.

On December 20, 2002, TMT gave T & L thirty days notice of its intent to terminate the

agreement. Roger Hood failed to keep his promises of sufficient customer business to make the arrangement viable.

20.

Prior to terminating the agreement, TMT approached Appalachian, seeking Appalachian to step into the shoes of T & L so that the agreement could continue. Appalachian rejected this suggestion, but proposed that TMT enter into a contract with it in exchange for Appalachian agreeing not to foreclose on the T & L trucks. TMT rejected this proposal and never entered into any agreement with Appalachian.

21.

On January 20, 2003, the agreement between TMT and T & L was terminated.

22.

As noted above, TMT provided certain lease payments to Appalachian on behalf of T & L. At the time of the termination of the agreement between TMT and T & L, TMT owed $166,105.64 in lease payments on behalf of T & L, minus any set-off to which TMT is entitled.

23.

At the time of termination, T & L owed to TMT $107,102.95 for repayment of the $225,000.00 loan. TMT is entitled to an offset for any lease payment due in the amount of $107,102.95.

24.

At the time of termination, plaintiffs had invested significant funds into the T & L trucks, which inured to the value of T & L, Roger Hood, and Appalachian. Plaintiffs had invested over $300,000.00 in the trucks, and got little use for their money. Thus, T & L, Roger Hood, and Appalachian owe to plaintiffs any value added to the trucks that was not earned.

25.

On February 5, 2003, Appalachian demanded payment from TMT in the amount of $178,295.22, consisting of lease payments in the amount of $166,105.34 and late charges in the amount of $12,189.88.

26.

During the term of the agreement, one of the T & L trucks was totaled in a wreck. Plaintiffs owe the fair market value of that truck to one of the parties.

27.

While one of the defendants may be owed lease payments not to exceed $166,105.34, Plaintiffs are entitled to a set-off of these lease payments due in the amount owed to TMT by T & L for prepayment of loans ($107,102.95) as well as the value of TMT's upgrades of the T & L trucks.

28.

In spite of the fact that no contract exists between plaintiffs and Appalachian, Appalachian has made a demand on plaintiffs for the lease payments due to T & L, as well as late charges. Moreover, Appalachian has made demand for the totaled truck.

29.

Given the demand made by Appalachian and TMT's agreement with T & L, plaintiffs are unsure which defendant is entitled to the lease payments due and indemnity for the wrecked truck, if any amount is ultimately deemed to be owed by plaintiffs.

WHEREFORE, plaintiffs pray for the following relief:

(1) That the Court declare the respective rights and duties of plaintiffs and defendants as to any contractual relationship (or lack thereof) between the parties and any amounts owed;

(2) That the defendants be ordered to pay to plaintiffs the value they received as a result of plaintiffs' upgrades of the trucks;

(3) That none of the defendants is entitled to recover from plaintiffs the amount owed by T & L to TMT - $107,000.00;

(4) That the Court determine the exact amount of lease and indemnity payments due to defendants, minus any set-off;

(5) That plaintiffs be awarded their costs, and expenses incurred herein; and

(6)  For such other relief as the Court deems just and proper.

By: _____
J. Todd Benson
La. Bar No. 23648
General Counsel
Tango Transport, Inc. and TMT, Inc.
P.O. Box 218
Hall Summit, Louisiana 71034
Telephone: (800) 368-0599
Facsimile: (318) 932-7294

ATTORNEY FOR TANGO TRANSPORT, INC.
AND TMT, INC.

ATTESTS A TRUE COPY
STUART SHAW
Clerk of Court

_____
Deputy Clerk/39th District Court
Red River Parish, Louisiana